# JENKINS v. OWENS-ILLINOIS GLASS CO.
## No. 59-1844-L.

Circuit Court, Duval County.
December 19, 1961.

Nathan Bedell of Bedell, Bedell & Dittmar, Jacksonville, for plaintiff.

Louis Kurz, Jr., of Ragland, Kurz, Toole & Martin, Jacksonville, for defendant.

WILLIAM H. MANESS, Circuit Judge.

*Memorandum of the court's findings of fact upon the submission of the issues to the court without a jury:* The tug "William L" left Riding Point at 1700 April 1, 1959 with a crew of five, including plaintiff's decedent, Capt. Charles M. Jenkins, the master, towing Pulpwood Barge No. 2, loaded. About 0530 on April 2, 1959 she established radio contact with the tug "Linden" whose position at 0540 was fixed at Lat. 27° 39′ N., Long. 79° 30′ W; about 28 miles distance on bearing of 315° from Matanilla Buoy. At 0800 the "William L" anchored Pulpwood No. 2 approximately 7 miles from said buoy (on bearing 113° from the buoy) where she was later transferred to the "Linden". The "Linden" did not reach the point of rendezvous until about 1320, where she anchored Pulpwood No. 1 and went farther southeasterly to the point of transfer where she took Pulpwood No. 2 in tow at 1420. After transferring one man, the mail and Pulpwood No. 2, the "William L" moved out to Pulpwood No. 1 to take her in tow. The winds were from SW 20 to 30 mph when the "William L" transferred No. 2 to "Linden", but the winds picked up while the "William L" was on the way to pick up Pulpwood No. 1. At the time the "William L" took the towing hawser from No. 1 the wind was up to from 33 to 38 mph and a squall was rapidly moving in on the operation. The No. 1 barge was heading generally southwesterly, into the wind, which made a "sail" out of her exposed hull above the water line. As the "William L" (headed southeasterly) began to attempt to move the barge, the barge lifted her anchor. The "William L" took the strain on the towing line and even with her engines full ahead almost immediately lost directional control; she became a tow and rolled over to starboard then to port until water entered the engine room hatch and her funnel. She then went under stern first.

Three factors contributed in whole or in part to this tragedy — (1) the weather, (2) the inadequacy and insufficiency of the "William L" for the service expected of her, and (3) the misjudgment of Capt. C. M. Jenkins. These three factors must be evaluated to arrive at a true verdict in this case.

(1) *Weather:* The winds at the time ranged from 35 mph steady, up to 50 mph in gusts but such winds were not so uncommon or extraordinary as to constitute "an act of God" and should have reasonably been anticipated and expected to exist in the par-

ticular area. Since such winds were to be expected generally, this court attributes no portion of the total blame for the sinking of the "William L" to an "act of God" as distinguished from the negligence of the master or owner in failing to anticipate such weather conditions.

(2) *The inadequacy and insufficiency of the "William L" for the service expected of her:* The operations of defendant in the transportation of pulpwood by barge from Grand Bahama Island to Jacksonville were just two years old when this tragedy occurred. Up until July 23, 1958 only one barge was used in the operation and little difficulty was experienced in bringing a loaded barge from Riding Point over the shallow water of the Little Bahama Bank to a rendezvous point at or near the 3 fathom line, even with small, less-adequate tugs. In such an operation the ocean-going tug "Linden" had nothing else to do while the one barge was being loaded except to wait as close in as possible and there was no need to rendezvous far out. It was during this one barge operation that the "William L" was purchased in order to have one tug to do the job the two "small, less-adequate tugs" were doing, and if she had been restricted to such operations she probably would be afloat today. The fact is she was not so restricted and it clearly appears that the margin of safety (if any) she had for the service expected of her in the one barge operation was lost upon the commencement of the two barge operation slightly less than nine months before she sank.

Although the precise place of rendezvous between the "William L" with a loaded barge and the "Linden" with an empty barge was by all verbal and written instructions left *sofely to the discretion of the master of the "William L"*, it was apparent from the start of the two barge operation that the slow end of the operation was the trip from the Little Bahama Bank to Jacksonville with a loaded barge and return. It was equally apparent that the farther the point of rendezvous could be pushed towards the northwest the more the operation could be speeded up which in turn would save the defendant $600 per hour. Therefore, the defendant in effect qualified its "safety first" policy with in structions in *bad weather* to rendezvous with the "Linden" as *far out* "as in the opinion of the captain of the 'William L' it is safe for him to navigate and make up to an incoming barge"; and, in *good weather* to rendezvous "as far north of Mangrove Key *as is humanly possible* — somewhere in the vicinity of Matanilla Shoals rather than in on the bank". Considering the slow speed at which the towing operation was conducted, both by the "Linden" and the "William L" and the probability of delays in making the rendezvous, the defendant should have reasonably foreseen that the best

master acting as a weather prophet could and would, in the course of time, encounter unforeseen weather conditions even after exercising apparently sound judgment in electing to proceed to a point in the vicinity of Matanilla Shoals.

Thus, an operation already made "marginal" from a safety standpoint by the employment of the "William L" beyond the restricted demands of a one barge operation, was made exceptionally hazardous by a company policy that pushed the rendezvous point as far to the north-northwest as possible.

Therefore, this court finds that the defendant was guilty of negligence in failing to furnish to plaintiff's decedent a tug reasonably safe and suitable for her actual and intended service; the court further finds that the "William L" was not a safe and suitable vessel to perform the service which defendant required of her, in that — (a)   She was not designed or expected to operate in sustained winds of 35 mph or gusts up to 45 mph;  (b)   She could not go off the Little Bahama Bank "except in optimum conditions", yet she was expected to go off bank "where humanly possible" and did sink on Middle Shoals at Lat. 27° 20′ N, Long. 78° 59′ W.;  (c)   Her superstructure and weight distribution was improperly designed or constructed or changed after the hull was built, she carried excess stores and parts apparently over and above her designed capacity and after she was put in service a 3,000 gallon ballast compartment was installed and utilized in the stern to lower and stern and reduce vibration, all of which contributed to or brought about the following deficiencies —

|  | Was | Should Be |
|---|---|---|
| Deck Tilt to Submersion | 5° | 7° |
| Freeboard | 1.35′ | 2.7′ |
| Range of positive Stability | 50° | 65° to 70° |
| Towing Bitt | 80% AFT | 52% to 65% AFT |
| Keel Drag | 2% | 4% to 5% |
| Metacentric Height | 2.61′ | 3.8′ |
| Inadequate Freeing Ports |  | 1 sq. ft. for each 5′ of length |

(3)   *The misjudgment of Capt. C. M. Jenkins:*   Notwithstanding the grave deficiencies of the "William L" for operations in the open waters north and west of Mangrove Cay, and notwithstanding the "company pressure" to speed up the total operation, Captain Jenkins, as master of the "William L", owed a duty to defendant to first protect the safety of the vessel, its crew and cargo, and to this end was required to use that degree of care and caution and skill which a reasonable and prudent person of his calling would exercise under the same or similar circumstance.  While it

may be open to question whether or not he violated this standard in electing to rendezvous "off the bank", 6 or 7 miles east of Matanilla Buoy (but within the 100 fathom line) at the time that decision was made, he did violate such standard in attempting to take Pulpwood Barge No. 1 (empty) under tow in the face of an approaching squall and while a southwest wind was then reaching a velocity of 33 to 38 mph. Furthermore, while he did not assume the risk of the design and operational shortcomings of the "William L", he either was aware or reasonably should have been aware of some of them by reason of his position as master and his prior operating experiences with her, all of which should have made more apparent to him the extraordinary and unnecessary risk he undertook in trying to take Pulpwood Barge No. 1 in tow under the existing circumstances.

Therefore, having found that both Captain Jenkins and defendant were each guilty of negligence, the court further finds that such negligence on the part of each contributed to and helped bring about the sinking of the "William L" and the death of Captain Jenkins. It is now the duty of the court to determine and apportion the negligence on the part of each. In so doing this court is convinced by the evidence that *but for* the negligence of each, this tragedy would not have occurred. In other words, the negligence of the defendant in failing to furnish a suitable vessel would not have produced this result at this time if Capt. Jenkins had delayed his efforts to take the barge in tow until after the wind subsided. On the other hand, had the vessel been staunch in design and construction (instead of a compromise of critical factors to achieve other goals) the misjudgment attributed to Captain Jenkins would have been overcome by the ability of the "William L" to maintain control and stability. Under such circumstances it is impossible to arrive at any more satisfying conclusion than that the negligence of each was equal, and each should share 50% of the blame.

On the question of total damages suffered by the widow and minor son of Captain Jenkins, for which the plaintiff is entitled to recover, the court finds that the amount of such damages after a reduction of 50% for the negligence of Captain Jenkins is the sum of $39,759, of which the minor son is entitled to $2,500. This court is of the opinion that there is no loss in fact attributable to the reduction or diminution in value of the deceased's future estate.

Accordingly, counsel for the plaintiff is directed to prepare for the court an appropriate judgment for the sums herein found due by defendant to the plaintiff.